# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| TERRY LAMAR BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 309-022 |
| | ) | |
| MARY ALSTON, et al.,[1] | ) | |
| | ) | |
| Defendants. | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The above-captioned case brought pursuant to 42 U.S.C. § 1983 is now before the

Court on the parties' cross motions for summary judgment (doc. nos. 50, 55). For the

reasons stated more fully below, the Court **REPORTS** and **RECOMMENDS** that Plaintiff's

one-paragraph motion for summary judgment be **DENIED**,[2] that Defendants' motion for

---

[1] Pursuant to Defendants' answer, the full and proper spelling of Defendant Nurse O'Niel's name is Eva O'Neal, and Defendant Dr. Hardin's name is Lewis Harden. (Doc. no. 31.) The **CLERK** is **DIRECTED** to change the docket accordingly.

[2] Plaintiff filed a one paragraph "motion for summary judgment" wherein he claims that he is entitled to summary judgment in the above-captioned case because:

> . . . Dr. Mary Alston, Dr. Hardin [sic], and Nurse Eva O'Neal and Dr. Schoolcraft, delayed me treatment for over 1 year, and caused my sores on face and butt to become way out of hand. . . . The medical dept. at Johnson S.P. did not treat my sores in a manor [sic], in which they would heal. So this is the reason your Honor you should grant me Summary Judgment on ALL named defendants.

(Doc. no. 50, p. 1.)  (Continued on next page.)

summary judgment be **GRANTED**, that a **FINAL JUDGMENT** be entered in favor of Defendants, and that this case be **CLOSED**.

## I.    Allegations in Plaintiff's Complaint

Plaintiff alleged in his complaint that Defendants Dr. Mary Alston, the Medical Director at Johnson State Prison ("JSP"), Nurse Eva O'Neal, a nurse at JSP, and Dr. Lewis Harden, a doctor employed by Georgia Correctional HealthCare ("GCHC"), were deliberately indifferent to his serious medical needs.[3] More specifically, Plaintiff alleged that Defendant Alston was "legally responsible . . . for the medical department," she delayed his treatment by being "negligent in treating him for the wrong infection," and refused to give him prescribed painkillers. Plaintiff alleged that Defendant O'Neal, while treating him for a sore on his buttocks, told Plaintiff that "they" had documents showing Plaintiff "digging [his] sores," and rather than re-bandage Plaintiff, she "ran" him out of the treatment room. Additionally Plaintiff alleged that his pain medication was discontinued because Defendant O'Neal reported that Plaintiff was hiding his pain medication under his tongue; Plaintiff

---

Notably, Plaintiff did not file the separate statement of material facts required by Local Rule 56.1 or any exhibits or other documents with his summary judgment motion. As such, Plaintiff's motion does not comply with the letter or the spirit of the Local Rule governing motions for summary judgment, and thus, should summarily be denied. See Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979) (*per curiam*) (affirming summary denial of motion for failure to comply with court's Local Rules).

[3]The Court is aware that in Plaintiff's complaint, he also named as Defendants Dr. Lewis, Keith Morris, FNU Souter, Dr. Henderson, and Dr. Schoolcraft. These defendants, with the exception of Dr. Schoolcraft, were dismissed by the presiding District Judge after a screening conducted pursuant to 28 U.S.C. §§ 1915(e) & 1915A. (Doc. no. 17.) Additionally, thereafter, Dr. Schoolcraft filed a motion to dismiss the claims against him. (Doc. no. 29.) This motion was granted, and Dr. Schoolcraft was also dismissed from the case. (Doc. nos. 45, 58.) Thus the only remaining claims are against Defendants Alston, O'Neal, and Harden.

2

alleged that Defendant O'Neal was "prejudiced against him" and "constantly harassed" him. Finally, as to Defendant Harden, Plaintiff alleged that he was negligent for treating him for the "wrong infection" and noted that Defendant Harden referred him to a psychiatrist after Plaintiff described that he "was getting long stringy things coming to heads in his sores on his face and butt." The Court allowed Plaintiff to proceed with his claims against Defendants Alston, Harden, and O'Neal for alleged deliberate indifference to his serious medical needs.

## II. Defendants' Unopposed Statement of Material Facts

Defendants deny Plaintiff's allegations. (Doc. no. 55.) Plaintiff has been in the custody of the Georgia Department of Corrections since September 2001 and has a prolonged history of chronic, self-injurious behavior and factitious disorder.[4] (Id., Statement of Material Facts ("SMF"), ¶¶ 1, 8-12, 14.) Defendants provide that Plaintiff received constant and proper treatment for his mental and physical health while he was incarcerated at JSP. Indeed, the record reflects that Plaintiff was seen over eight (80) times by medical personnel from November 4, 2007, through April 16, 2009[5]; these treatments included, among other things, cultures taken for testing, consultations with specialists, and visits to outside medical

---

[4]Factitious dermatitis is an intentional self-inflicted cutaneous injury. (Doc. no. 55, Statement of Material Facts, ¶ 3, Ex. A.) The motivation for this behavior is a psychological need to assume the sick role. (Id.) Factitious disorder is manifested where patients consciously produce skin lesions with their fingernails, other objects, or chemical substances, which may be perpetuated by the ongoing excoriation of the skin. (Id.) Plaintiff was treated for skin lesions as early as 1997. (Id.) For example, in February 2001, Plaintiff received a fifth skin graft to repair self-inflicted excoriations to an open wound on his shoulder. (Id.)

[5]Plaintiff commenced the above-captioned case on March 6, 2009.

3

facilities concerning Plaintiff's skin lesions.[6] (Id., ¶¶ 15, 18, 22, 24, 27, 29, 78-81, 91-92, 98, 104, 118, 121, 144.)

Finally, concerning Plaintiff's complaints that his pain medications were discontinued, Defendants provide that while incarcerated at JSP, Plaintiff was prescribed: Tylenol #3 with codeine, Tylenol #2, Motrin 400mg, Motrin 600mg, Motrin 800mg, Utram, Toradol, Percogesic, Percoset, Vicodin, Ibuprofen, and Darvocet. (Id., ¶¶ 19, 28, 33, 42, 53-54, 57, 59-60, 69, 71, 77, 80, 85, 87-88, 91, 93, 102, 112, 118, 135, 141, 145.) On November 4, 2007, Plaintiff was prescribed Tylenol #3, in response to his complaints of chronic shoulder pain. (Id., ¶ 19.) This prescription was renewed twice, but was canceled by Defendant Alston on January 7, 2008, because Plaintiff was caught hiding the medication, a narcotic drug, under his tongue. (Id., ¶¶ 33, 42-45.) Defendant Alston has a policy to cancel narcotic prescriptions of patients who are found to be abusing the prescriptions. Defendant Alston implemented the policy because the narcotic prescriptions can be amassed and used in suicide attempts, and can also be used illegally to barter between prisoners. (Id., ¶ 45.) Additionally, at all times while he was incarcerated at JSP, Plaintiff had non-narcotic Tylenol available upon request. (Id., ¶ 46.)

A review of Plaintiff's medical records shows that from November 2007 through April 2009 he received medical treatments for his lesions on a regular basis.[7] A summary

---

[6]Plaintiff was seen over seventy-two (72) times by mental health professionals from November 4, 2007 through April 16, 2009. (Doc. no. 55, SMF, ¶¶ 14, 26, 31, 47, 51, 64, 66, 73, 83, 86, 94, 99-100, 109, 111, 120, 123, 128, 137, 139, 140.)

[7]The Court will only list the dates Plaintiff received medical treatment for his skin lesions, as they are the basis of his complaint. Notably, Plaintiff's medical records show that he was treated on numerous other occasions (in addition to those specifically cited by the

of Plaintiff's medical treatment is as follows.

A. **Medical Treatment for the Period of November 4, 2007 – April 24, 2008**

By November 4, 2007, Plaintiff's documented medical problems included "carbuncle face, MRSA . . . anxiety and panic attacks, [and] a history of mental health issues. . . ." (Doc. no. 55, SMF, ¶ 16.) On November 5, 2007, Plaintiff was seen by Nurse Mitchell concerning skin lesions on his face, and an appointment was to be treated by Defendant Alston was scheduled. On November 13, 2007, Plaintiff was seen and treated by Defendant Alston. (Id., ¶¶ 22, 23.) On that date, Defendant Alston took nasal swabs and fingernail scrapings for laboratory testing; she also prescribed Plaintiff Bactroban, and Bactrim.[8] (Id., ¶¶ 14, 16, 21.) Plaintiff received the Bactroban ointment applications and lesion dressing changes on a regular basis through November 26, 2007. (Id., ¶ 23.) On November 15 and 18, 2007, Plaintiff's lab work was completed and indicated scant to moderate growth of MRSA (a bacterial infection that is resistant to a large group of antibiotics). (Id., ¶ 24.) On February 8, 2008, Plaintiff was given prescriptions for Bactrim, Doxycycline, and Bactroban cream. (Id., ¶ 57.) On February 21, 2008, Plaintiff was prescribed more Bactroban ointment. (Id., ¶ 58.) On March 16, 2008 Plaintiff was seen by Dr. Henderson, who noted that Plaintiff had a history of cellulitis, excoriating his skin, and factitious skin disorder; Dr. Henderson prescribed Ultram, Lidocaine ointment, and the Bactrim prescription was renewed. (Id., ¶ 59.) On March 18, 2008, Plaintiff was seen by a nurse at 9:20 a.m., for lesions on his

---

Court) for other medical issues. (See, e.g., doc. no. 55, SMF, ¶¶ 26, 27, 29, 30, 31, 32, 34, 36, 38, 39, 40, 47, 48, 49, 51, 52, 53, 55, 56, 64, 66, 73, 83, 94, 95, 96, 97, 99, 100, 101.)

[8]Bactroban and Bactrim are antibacterial ointment and an antibiotic. (Doc. no. 55, SMF, ¶¶ 22, 23.)

buttocks; the nurse referred Plaintiff to an upper level provider that day. (Id., ¶ 62.) Also on March 18, 2008, Plaintiff was seen by a nurse practitioner at 10:00 a.m. (Id., ¶ 63.) On April 2, 2008, Plaintiff was seen by a nurse for lesions on his rectum and face, he was advised to continue using Keflex. (Id., ¶ 65.) On April 24, 2008, Plaintiff was seen by a registered nurse concerning complaints of lesions to his face and buttocks. At that time, Plaintiff admitted to the registered nurse that the had been picking at his sores; because of Plaintiff's history of misuse and no-compliance with his ointments and creams, the registered nurse scheduled his treatments for the lesions with a nurse. (Id., ¶ 67.)

**B.      Medical Treatment for the Period of May 1, 2008 – June 28, 2008**

From May 1 through 5, 2008, Plaintiff received his Bactroban ointment in "medical." (Id., ¶ 68.) On May 13, 2008, Plaintiff was seen by Defendant O'Neal for complaints of a "sore" on his buttocks. (Id., ¶ 67.) Plaintiff told Defendant O'Neal that he had the sore for approximately two weeks and stated that he had "tried to dig the core out." (Id.). Defendant O'Neal applied Bacitracin after cleaning the wound and scheduled Plaintiff for appointments with a nurse for the next three days. (Id.). From May 14 through 16, 2008, Plaintiff was seen by a nurse for the cleaning and dressing of his sores. (Id., ¶ 70.) On May 14, 2008, Plaintiff was also seen by a second nurse for complaints of pain in his neck, cheek bones, tail-bone, and feeling sick to his stomach; he was given something for his pain. (Id., ¶ 71.) On May 20, 2008, Plaintiff was seen by Defendant Harden for complaints of draining from his perirectal area; cultures of the area were taken. (Id., ¶ 72.) Notably, because of Plaintiff's history of abusing narcotic pain medication, he was denied the specific pain medication he requested, but was prescribed a comparable pain medication. (Id.).      On May 27, 2008,

6

Plaintiff was seen by a registered nurse for his complaints concerning his skin lesions; he was referred to an upper level provider. (Id., ¶ 75.) Also on May 27, 2008, Plaintiff was seen by Defendant Harden who examined him, prescribed him medication for pain, and requested that Plaintiff receive a consult with a dermatologist. (Id., ¶ 76.) On May 28, 2008, Defendant Harden prescribed Plaintiff Tylenol #2 in lieu of the medication he had previously prescribed, and again requested that Plaintiff receive a dermatology consult for his "chronic skin ulcers." (Id., ¶ 77.) The consult was approved that day. (Id.)

On May 30, 2008, Plaintiff was seen by medical personnel at Augusta State Medical Prison ("ASMP") for his skin ulcerations; a culture was taken; and he was given an antibiotic, pain medication, and Lidocaine. (Id., ¶ 78.) On June 13, 2008, Plaintiff was seen by Defendant O'Neal for complaints of lesion pain to his rectum; he was examined, treated, and scheduled for an appointment with an upper level provider for June 16, 2008. (Id., ¶ 82.) On June 16, 2008, Plaintiff was seen by Defendant Harden for complaints that he pulled something out of his perirectal abrasion. (Id., ¶ 84.) Defendant Harden noted that there was no evidence at the site from where this "material" would have come. (Id.). He further noted that the wounds were healing. (Id.) Plaintiff's Lidocaine prescription was discontinued. (Id.) On June 20, 2008, Plaintiff was seen by Defendant O'Neal for complaints that his tail-bone hurt, he was prescribed pain relief medication, and an appointment was scheduled for an upper level provider for June 23, 2008. (Id., ¶ 85.) On June 23, 2008, Defendant Alston prescribed Plaintiff Motrin, Bactrim, and Telfar tape for dressing his facial wounds. (Id., ¶ 87.) On June 24, 2008, Plaintiff was seen by Defendant Alston for a follow up to his dermatology appointment at ASMP and complaints of pain. (Id., ¶ 72.) Plaintiff was

prescribed Lidocaine, Darvocet, Betacept cleanser, and Bactrim. A culture was taken, and Defendant Alston requested a follow up dermatology consultation at ASMP. The consult was approved and was scheduled for August 1, 2008. Also on June 24, 2008, Defendant Alston prescribed wound care appointments for Plaintiff in which his facial wounds would be covered with Telfar. Finally, labs for the wounds on his buttocks were ordered. (Id., ¶ 88.) On June 25, 2008, Plaintiff was sent to Baldwin State Prison ("BSP") for treatment of facial impetigo and cellulitis of his buttocks from e-coli; he returned to JSP on June 30, 2008. (Id., ¶ 91.) On June 30, 2008, upon his return from BSP, Defendant Alston discontinued some of the medications prescribed to Plaintiff while he was at BSP, and instead prescribed Plaintiff with alternative, comparable, medications. (Id., ¶ 93.)

C. **Medical Treatment for the Period of July 31, 2008 – December 18, 2008**

On July 31, 2008, Plaintiff was taken to ASMP for a dermatology consult, he returned to JSP on August 2, 2008.[9] (Id., ¶ 98.) On August 20, 2008, Plaintiff was seen by Defendant Harden for a follow up to Plaintiff's dermatology consult. Plaintiff's requests for a specific pain medications were denied, and the precautions concerning the proper use of Lidocaine were renewed. Plaintiff was then referred back to dermatology in two months. (Id., ¶ 102.) On August 30, 2008, Plaintiff was seen by a doctor for complaints of new lesions on his buttocks; he was prescribed Doxycycline, and he was scheduled for an appointment with an upper level provider. (Id., ¶ 103.) On September 2, 2008, Plaintiff was seen by Defendant

---

[9]On August 8, 2008, a mental health personnel at JSP determined that Plaintiff was intentionally producing symptoms, picking at his lesions, and compulsively delaying the healing of his wounds; Plaintiff's prescription of Remeron was increased on that date. (Doc. no. p. 55, SMF, ¶ 99.)

Harden, who noted an exacerbation of dermatitis, thought to be factitious; a prescription of Telfar pads was written, and a culture was taken. (Id., ¶ 104.) On September 4, 2008, Plaintiff was issued Bactroban, antibiotics, and Telfar pads. (Id., ¶ 105.) On September 18, 2008, Plaintiff was seen and treated by a nurse for complaints of a lump on the right side of his buttocks. (Id., ¶ 106.) On September 23, 2008, Plaintiff was seen by a doctor; he was given a physical examination and provided Lidocaine. (Id., ¶ 108.) On October 20, 2008, Plaintiff was seen and treated by Defendant Harden; he noted that the lesions on Plaintiff's buttocks were healing. (Id., ¶ 110.) On December 4, 2008, Plaintiff was seen and treated by a nurse concerning his skin lesions. (Id., ¶ 115.) On December 18, 2008 Plaintiff was seen and treated by a nurse for a follow up on his skin lesions. (Id., ¶ 118.) From December 18, 2008 through January 2009, Plaintiff's lesions were cleaned and the dressings were changed by the medical department personnel.

### D.    Medical Treatment in 2009

On January 28, 2009, Plaintiff was seen by Defendant O'Neal for wound care; Plaintiff told Defendant O'Neal that he was digging at his sores. (Id., ¶ 124.) On February 2, February 18, and March 1, 2009, Plaintiff was seen by a nurse for wound care. (Id., ¶¶ 126, 129, 131.) On March 2, 2009 Plaintiff was seen and treated by a doctor; it was noted that Plaintiff had new lesions on his buttocks. Therefore, Plaintiff's prescriptions were renewed. (Id., ¶ 132.) On March 11, 2009, Plaintiff was seen by a nurse for a dressing change. During the treatment, Plaintiff indicated that he was out of the medication he received on March 2, 2009. The nurse informed Plaintiff that it was too early to receive another prescription. Plaintiff responded to the nurse that he was about to have "steam come

9

out" of his head, and chose to leave the nursing treatment unit. (Id., ¶ 135.) Plaintiff's complaint was filed on March 6, 2009.

## III. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[10] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929

---

[10] The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### B. Merits of Plaintiff's Claims

Plaintiff, in his complaint argued that Defendants were deliberately indifferent to his serious medical needs. (Doc. nos. 1, 4.) Defendants deny Plaintiff's allegations and state that they provided Plaintiff with appropriate and constant treatment. (Doc. no. 55.) Additionally, Defendants asserts that Defendant Alston cannot be held accountable for any purported constitutional violations against Plaintiff based on a theory of supervisory liability. (Id.)

Bearing the standard for a motion for summary judgment in mind, Defendants'

motion for summary judgment should be granted. To survive Defendants' motion for summary judgment, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that Plaintiff had an objectively serious medical need, (2) that Defendants acted with deliberate indifference to that need, and (3) that Plaintiff's injury was caused by Defendants' wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Turning to the first prong, the Court is aware of Defendants' statement that "Plaintiff's self-inflicted skin lesions and self-perpetuated infections should not be considered objectively serious medical needs." (Doc. no. 55, p. 10.) Although, Defendants suggests that Plaintiff does not have a serious medical need, the Court need not decide this issue because even assuming for the sake of argument that Plaintiff did have a serious medical need, he has not shown deliberate indifference.

To show that Defendants were deliberately indifferent to his needs, Plaintiff must offer some proof that Defendants: (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendant disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Id. In addition, the prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what

constitutes a serious medical need of prisoners.").

## 1. No Evidence of Disregard to Serious Medical Need

There is no evidence in the record showing that Defendants disregarded any risk to Plaintiff's medical needs, nor that Plaintiff received any thing but the proper treatment for his self-inflicted sores. The record reflects that while incarcerated at JSP, he received near constant medical attention concerning his medical needs. From November 2007 through April 2009, Plaintiff was seen by medical personnel for his physical ailments approximately 80 times. Plaintiff argues: Defendants Alston and Harden improperly diagnosed him; 2) Defendant O'Neal refused to treat him on one occasion, and reported that he was hiding his narcotic pain medication under his tongue; and 3) Defendant Alston improperly refused to provide him with pain medication. Plaintiff does not provide any documentation in support of his claims. Defendants on the other hand, provided Plaintiff's medical records which clearly refute each of Plaintiff's allegations.

First, contrary to Plaintiff's conclusory allegations, his medical records do not show that he was misdiagnosed. Rather, the medical records show that by November 4, 2007 Plaintiff had been diagnosed with, among other things, MRSA (doc. no. 55, Alston Aff., ¶ 10 (citing Ex. C-1, p. 351)). The records show that on November 13, 2007, Defendant Alston took some cultures from Plaintiff; the results indicated scant to moderate grown of MRSA (doc. no. 55, Alston Aff., ¶¶ 16, 18 (citing Ex. C-1, pp. 344, 346-49)). Additionally, on May 30, 2008, Plaintiff was seen by medical personnel at ASMP regarding his skin ulcerations, a culture was taken (doc. no. 55, Alston Aff., ¶ 68 (citing Ex. C-1, pp. 28, 271,

274)). Next, the records provide that Plaintiff remained at ASMP from May 30 until June 9, 2008. During that time, a biopsy was performed of Plaintiff's skin. The medical personnel at ASMP determined that Plaintiff's wounds to his face and buttocks were self-inflicted, recommended a treatment similar to the treatment that Defendant Alston had prescribed, and noted that he should have an appointment made with a psychologist (doc. no. 55, Alston Aff., ¶ 69 (citing Ex. C-1, pp. 22-27, 61-79, 209, 246-262)).

On June 24, 2008, Defendant Alston requested a follow up dermatology consultation that was approved and scheduled for August 1, 2008 (doc. no. 55, Alston Aff., ¶ 78 (citing Ex. C-1, p. 20)). On June 25, 2008, Plaintiff was transferred to BSP for treatment of facial impetigo and cellulitis of his buttocks from e-coli (doc. no. 55, Alston Aff., ¶ 80 (citing Ex. C-1, pp. 19, 54-56, 183-86, 192)). Furthermore, according to the medical records, on July 31, 2008, Plaintiff was sent back to ASMP for a followup dermatology consult (doc. no. 55, Alston Aff., ¶ 87 (citing Ex. C-1, p. 172-74)). Thereafter, on December 18, 2008, a culture was taken from his skin lesions and revealed negative for fungus (doc. no. 55, Alston Aff., ¶ 103 (citing Ex. C-1, p. 12-13, 133, 139-40)); and on January 17, 2009, another culture was taken of Plaintiff's lesions (doc. no. 55, Alston Aff., ¶ 106 (citing Ex. C-1, p. 47)). Thus, Plaintiff's medical records provide that his sores were self inflicted, he was repeatedly tested by multiple medical personnel, and was similarly treated by the various medical personnel. As such, the records clearly indicate that Plaintiff was not misdiagnosed by Defendants Alston or Harden. Notably, Plaintiff has put nothing in the record to contradict his thorough and detailed medical records.

Similarly, Plaintiff's deliberate indifference claim against Defendant O'Neal also

14

fails. Plaintiff's medical record establishes that Defendant O'Neal repeatedly, and appropriately treated Plaintiff. The record reflects that Plaintiff was seen by Defendant O'Neal on May 13, 2008 for complaints of a "sore" or his buttocks. (Doc. no. 55, Ex. C-1, p. 285.) Plaintiff indicated that he had the sore for approximately two weeks and stated that he had "tried to dig the core out." (Id.) Defendant O'Neal applied Bacitracin after cleaning the wound, and scheduled appointments for Plaintiff with a nurse for the next three days. (Id.) Additionally, Defendant O'Neal advised Plaintiff to keep the area clean, stop scratching the sore, and to come to his medial appointments as instructed. (Id.) Defendant O'Neal also treated Plaintiff on June 13, 2008 for complaints of lesion pain to his rectum. (Id. at 200-01.) Defendant O'Neal examined Plaintiff and advised him to keep the area clean and covered, not to scratch or rub the area, and to wash his hands thoroughly. (Id.) Defendant O'Neal also scheduled a wet to dry dressing change for five days as well as scheduled an appointment with an upper level provider. (Id.) Next, the record shows that Defendant O'Neal treated Plaintiff on June 20, 2008, for complaints that his tail-bone hurt. On January 28, 2009, Plaintiff was seen by Defendant O'Neal for wound care. (Id. at 45) At that visit, Plaintiff indicated to Defendant O'Neal that he was digging at his sores. (Id.) Defendant O'Neal instructed Plaintiff to not scratch or dig his sores, and provided him with a treatment for his wound. (Id.) Thus, the record directly refutes Plaintiff's allegations that Defendant O'Neal failed to bandage him and "ran" him out.

## 2. No Refusal of Pain Medication

Plaintiff, in his complaint, also claimed that Defendant Alston refused to provide him with pain medication. Although Plaintiff might not receive the specific medications he

15

desires, the record reflects that during his incarceration at JSP he was provided and/or prescribed: Tylenol #3 with codeine, Tylenol #2, Motrin 400g, Motrin 600g, Motrin 800g, Utram, Toradol, Percogesic, Percoset, Vicodin, Ibuprofen, and Darvocet. (Id., ¶¶ 19, 28/, 33, 42, 50, 53-54, 57, 59-60, 69, 71, 77, 80, 85, 87-88, 91, 93, 102, 112, 118, 135, 141, 145.) On November 4, 2007, Plaintiff was prescribed Tylenol #3, in response to his complaints of chronic shoulder pain. (Id., ¶ 19.) Notably the Tylenol #3 prescription was renewed twice, but was in fact canceled by Defendant Alston on January 7, 2008, because Defendant O'Neal reported that she caught Plaintiff hiding the narcotic pain medication, under his tongue (Id., ¶¶ 33, 42-45). Pursuant to the policy to cancel narcotic prescriptions of patients who are found to be abusing the prescriptions, Plaintiff's prescription was cancelled. Importantly, however, at all times while he was incarcerated at JSP, Plaintiff had non-narcotic Tylenol available upon request. (Id., ¶ 46.)

In any event, that Plaintiff was not given the specific medication he believed he should receive does not elevate his claim to the level of deliberate indifference. Indeed, it should be recognized that the mere fact that a prisoner "may have desired [a] different mode[] of treatment" does not give rise to a claim for deliberate indifference. Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). "Where a prisoner has received . . . medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments." Id. (citation omitted). Put another

way, a mere difference in opinion between prison medical officials and the inmate as to the latter's diagnosis or course of treatment will not support a claim of cruel and unusual punishment. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991); Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).

Furthermore, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." West, 320 F.3d at 1243 (internal quotation and citation omitted). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

As the record reflects that Plaintiff, during his incarceration at JSP, was provided and/or prescribed: Tylenol #3 with codeine, Tylenol #2, Motrin 400g, Motrin 600g, Motrin

17

800g, Utram, Toradol, Percogesic, Percoset, Vicodin, Ibuprofen, and Darvocet, and more importantly, at all times had non-narcotic Tylenol available upon request, his argument that Defendant Alston refused to provide him with pain medication fails.

### 3. Delay of Treatment

To the extent Plaintiff argued that Defendants Alston and Harden misdiagnosed his skin condition and thus delayed in providing him with proper treatment, his argument fails. First, nothing in the record supports the conclusion that Defendants were deliberately indifferent to Plaintiff's alleged serious medical needs because of an alleged delay in providing Plaintiff with appropriate medical treatment. As noted previously, "[a]n inmate who complains that [a] delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment to succeed." Hill, 40 F.3d at 1188, *abrogated on other grounds by* Hope, 536 U.S. 730 (2002). "Whether [a] delay in treatment was tolerable depends on the nature of the medical need and the reason for the delay." Farrow, 320 F.3d at 1247.

Despite Plaintiff's contention, the record reflects that Plaintiff received appropriate, constant medical treatment. As noted above, the record reflects that Defendants Alston and Harden properly diagnosed and treated Plaintiff. Moreover, Plaintiff's claim for deliberate indifference also fails because the record does not contain <u>any</u> verifying medical evidence to establish a detrimental effect from any purported delay in medical treatment. Indeed, Plaintiff himself does not allege any detrimental effect. The record is simply devoid of any evidence that a delay in treatment could have caused or exacerbated any of Plaintiff's self

inflicted injuries.

In sum, Plaintiff has not shown a delay in medical treatment. Even assuming for the sake of argument that there had been a delay in medical treatment, that assertion alone is insufficient to generate a dispute of material fact because Plaintiff has not shown that the purported "delay" in treatment had a detrimental effect on him. Rather, the record demonstrates that, while incarcerated at JSP, Plaintiff received prompt constant treatment.

## C.  Supervisory Liability

Plaintiff's claim for supervisory liability against Defendant Alston must also fail. As a supervisor, Defendant Alston cannot be held personally liable under § 1983. "Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 & 694 n.58 (1978). To hold a supervisory official or an employer liable, Plaintiff must demonstrate that either (1) the supervisor actually participated in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. Hartley, 193 F.3d at 1269 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)).

In this case, as the Court has determined that no Defendant has violated any of Plaintiff's constitutional rights concerning a serious medical need, Plaintiff cannot maintain a § 1983 action for supervisory liability. Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005) (reversing of district court's denial of summary judgment, because the Eleventh

Circuit concluded that plaintiff's constitutional rights were not violated, thus, plaintiff could not maintain a § 1983 action for supervisory liability against the defendant). As such, Defendant Alston is entitled to summary judgment on Plaintiff's claim against her based on supervisory liability.[11]

## IV. Conclusion

Without a doubt, the record in this case conclusively shows that Plaintiff engaged in a pattern of self-inflicted skin wounds and injuries in an effort to gain access to the pain medication of his choosing. To their credit, Defendants repeatedly and humanely treated Plaintiff's injuries, attempting to address both the physical and mental causes of Plaintiff's ailments. In return for their efforts, Defendants were forced to defend themselves and their reputations in a court of law because Plaintiff made, what has now been shown to be, baseless allegations of mistreatment. The circumstances of this case represent a reprehensible waste of scarce resources, not only in the form of Plaintiff's attempted manipulation of medical services available in the state prison system, but also in the time and expense of the legal services required to defend the claims in this lawsuit. The Court is well aware that the law provides the means by which prisoner plaintiffs can protect their rights behind prison walls. However, this case is a frustrating example of what happens when the system is misused by a prisoner out to do little more than obfuscate his own malicious intent to try to harm the hard working health care professionals toiling within the state prison system.

---

[11]The Court's conclusion in this regard pretermits consideration of Defendants' remaining arguments.

Therefore, the Court **REPORTS** and **RECOMMENDS** that Plaintiff's motion for summary judgment (doc. no 50) be **DENIED**, that Defendants' motion for summary judgment (doc. no. 55) be **GRANTED**, that judgment be **ENTERED** in favor of Defendants, and that this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 26th day of July, 2010, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE